UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JOHN MITCHELL, an individual, ) | |
| ) | |
| Plaintiff, ) | Case No. 2:24-cv-79 |
| ) | |
| v. ) | |
| ) | **COMPLAINT** |
| TYSON FOODS, INC. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## **INTRODUCTION**

1. Plaintiff John Mitchell seeks relief from Defendant Tyson Foods, Inc.'s ("Tyson" or "Defendant") pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious exemptions from Tyson's COVID-19 vaccination mandate policy.

2. On August 3, 2021, Defendant imposed a draconian vaccine mandate for all employees. Defendant's mandate addresses a very remote risk, asymptomatic deadly spread of COVID-19 to fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of COVID-19 than asymptomatic spread.

3. Defendant responded to their employees seeking religious, disability and medical exemptions by informing those employees that they would be effectively terminated on November 1, 2021 and placed on an unpaid, unprotected, and unprecedented leave of absence with no assurance that they would be allowed to return to the workplace for up to one year (hereinafter Tyson's "Vaccine Mandate").

1

4.  Defendant's unlawful actions left Plaintiffs with the impossible choice of suffering a physical assault and uninvited invasion of their bodies by receiving the experimental and harmful mRNACOVID-19 vaccine, at the expense of her religious beliefs, bodily autonomy, medical privacy, and her health, or losing their livelihoods.

5.  This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Texas civil rights law.

6.  Defendants' actions violated federal and Texas law by mandating an experimental medical treatment, retaliating against employees who engaged in protected activity, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7.  Plaintiffs respectfully implore this Court to order that Defendants comply with the laws protecting the rights of the citizens of Texas against precisely such catch-22 "choices."

## PARTIES

8.  Plaintiff John Mitchell ("Plaintiff" or "Mitchell") was employed as a machining and welding supervisor at Tyson's plant in Amarillo, Texas, ("Amarillo plant") who requested an exemption from the Vaccine Mandate on religious grounds. Tyson denied his exemption request. Instead, Tyson placed Mr. Mitchell on an unelected, unpaid, and unprotected leave of absence. Mr. Mitchell is a citizen of Texas.

9.  Defendant Tyson Foods, Inc. ("Tyson"), together with its subsidiaries, is a corporation that operates as a worldwide food processing and marketing company.

10. Tyson is the world's largest processor and marketer of chicken, beef, and pork.

11. At all relevant times, Tyson knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. §§ 2000e et seq.; the Americans With Disabilities Act pursuant to 42 U.S.C. §§ 12010 et seq.

13. This Court has supplemental jurisdiction over the state claims raised in this action pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Defendant Tyson it transacts business in Texas, and the wrongful conduct and resulting injuries alleged herein substantially occurred in this state.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the cause of action arises primarily from Tyson's Amarillo plant situated in Potter County.

16. An actual and justiciable controversy exists between Plaintiffs and Defendant.

## FACTS AND BACKGROUND

**Coronavirus and Tyson's Response**

17. In the spring of 2020, Tyson began implementing mitigation procedures for its workforce, including several of the following requirements for its employees: masks, face

shields, social distancing, temperature checks, COVID-19 testing,[1] and self-quarantines.[2] Tyson initially made several accommodations for hourly employees.[3] For example, in March of 2020, the company relaxed attendance policies in its plants by "[]eliminating any punitive effect for missing work due to illness."[4]

18. Tyson experienced substantial success reducing the risk of COVID-19 spread through self-quarantining for the symptomatic and testing for the asymptomatic persons. As even Anthony Fauci admits, the risk of asymptomatic spread is very rare and very low, with experts estimating it is largely a non-existent risk. At worst, asymptomatic risk of employees spreading lethal COVID-19 is less than one-in-a-million. Even in that one-in-a-million risk, testing easily addresses asymptomatic risk without requiring bodily invasion against a person's will of an experimental drug with unknown long-term side effects due to its novel mRNA methodology, with the worst short-term adverse events reported in the government's VAERS database in American history, and whose administration offends the conscience of millions of Americans' deeply held spiritual

---

[1] Tyson Foods, Tyson Foods CEO Provides Update on Efforts to Address COVID-19(April 6, 2021) available at https://www.tysonfoods.com/news/news-releases/2020/4/tyson-foods-ceo-provides-update-efforts-address-covid-19 (last visited Sept. 27, 2021); Tyson Foods, Why Tyson Has Taken a Leading Position on COVID-19 Testing (July 1, 2021) available at https://thefeed.blog/2020/07/01/covid-19-testing-at-tyson-foods/ (Last visited Sept. 27, 2021).

[2] Tyson Foods, Protecting Team Members and Our Company; Ensuring Business Continuity (March 17, 2020) available at https://www.tysonfoods.com/news/news-releases/2020/3/protecting-team-members-and-our-company-ensuring-business-continuity (last visited Sept. 27, 2021); Chattin Cato, Tyson Team Innovates to Make Face Shields for Frontline Workers (July 6, 2021) available at https://thefeed.blog/2020/07/06/tyson-innovates-to-make-face-shields-for-frontline-workers/ (last visited Sept. 27, 2021).

[3] *Ibid.*

[4] *Ibid.*

beliefs and religious faith due to the use of aborted fetal cells in its testing, development and production of each of these experimental vaccines.

19. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020. One week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine. Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.

20. Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines available for use in the United States at the time in question are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses. Pfizer's FDA-approved Comirnaty vaccine had not yet been administered to the public.

**Tyson's Unlawful Vaccine Mandate**

21. We face an unparalleled moment in history, when employers have begun mandating an experimental vaccine that utilizes novel technology and, not only has conferred little to no benefit to recipients, but has injured tens of thousands of individuals who elected or were forced to receive the vaccine by virtue of vaccination mandates exactly like Tyson's.

22. On approximately August 3, 2021, Tyson publicly announced it would require all "[]team members at U.S. office locations to be fully vaccinated by October 1, 2021."[5] (A true and correct copy of Tyson's August 3, 2021 COVID-19 vaccine mandate, is attached

---

[5] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccination for its U.S. Workforce* (Aug. 3, 2021) available at https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).

as *Exhibit A,* and incorporated herein by reference). Tyson also announced that all other plant team members would be required to be vaccinated by November 1, 2021.

23.     In announcing the mandate, Tyson CEO Donnie King justified the decision by claiming, "[]the U.S. Centers for Disease Control and Prevention is reporting ***nearly all hospitalizations and deaths*** in the U.S. are among those who are unvaccinated" (emphasis added).[6] As set forth herein below, Mr. King's statement was false.

24.     Tyson publicly stated that "Exceptions to the vaccination mandate will involve workers who seek medical or religious accommodation."

25.     For those employees whose religious or medical exemptions were granted, Tyson placed them on an unelected, unpaid, and unprotected leave of absence. Under this policy, employees were not officially terminated, but were denied access to work and received no compensation or benefits.

26.     Employees placed on LOA+ were given one year during which time if they got vaccinated, they could potentially return to work but their original position was not guaranteed. At the end of the year, if they remained unvaccinated, they were terminated.

**Tyson's Vaccine Mandate Will Not Stop the Spread of COVID-19**

27.     The real-world experience of mRNA vaccines continues to undermine claims of efficacy. The efficacy of all three available vaccines has been drastically waning and is a far cry from what was originally promised.

---

[6] Donnie King, *Our Next Step in the Fight Against the Pandemic* (Aug. 3, 2021) available at https://web.archive.org/web/20210803143911/https://thefeed.blog/2021/08/03/our-next-step-in-the-fight-against-the-pandemic/ (last visited Sept. 27, 2021).

28. More than a year after the COVID-19 biologics have been introduced to the American public *en masse,* the reports of adverse events and death from the injections are staggering and far exceed that which has been seen from any vaccine in human history.

29. Data released on May 20, 2022 by the Centers for Disease Control and Prevention (CDC) showed that since December 14, 2020, a total of 1,322,709 adverse events following vaccination were reported to the Vaccine Adverse Event Reporting System (VAERS), with 30,942 deaths reported.[7]

30. This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[8] The CDC has failed to account for this underreporting.

31. The input of event reports to VAERS since the COVID vaccines were rolled out is **greater than all cumulative adverse event reports to VAERS for the prior 30 years**: an alarming statistic.

32. There have been a myriad of short-term vaccine side effects that have been witnessed and reported since the rollout of the vaccines, including myocarditis, pericarditis, Guillain-Barre syndrome, blood clots, reproductive health issues, and more.

---

[7] Vaccine Adverse Event Reporting System (VAERS), CDC Wonder, available at https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=DA4BD564C41F4D061172AC48FE4C.

[8] Varricchio F, Iskander J, Destefano F, Ball R, Pless R, Braun MM, Chen RT. Understanding vaccine safety information from the Vaccine Adverse Event Reporting System. Pediatr Infect Dis J. 2004 Apr;23(4):287-94. doi: 10.1097/00006454-200404000-00002. PMID: 15071280.

33. We now know that vaccine-induced spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood-brain barrier. Spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries.[9] Since there exists no way to turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person.

34. Furthermore, strong but not yet conclusive evidence links spike protein in vivo to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes, the very severe effects of COVID-19 disease itself. The damage the spike protein may be causing must be fully elucidated. The toxicity of the spike protein means that no vaccine using this design can be assumed to be safe until proven otherwise.

35. Studies have also shown that antibody-dependent enhancement ("ADE") poses a severe threat to vaccinated individuals.[10] "ADE occurs when the antibodies generated during an immune response recognize and bind to a pathogen, but they are unable to provide infection. Instead, these antibodies act as a 'Trojan horse,' allowing the pathogen to get into cells and exacerbate the immune response."[11] Thus, when dealing with

---

[9] SARS-CoV-2 mRNA Vaccine Biodistribution Study, https://www.docdroid.net/xq0Z8B0/pfizer-report-japanese-government-pdf.

[10] Infection-enhancing anti-SARS-CoV-2 antibodies recognize both the original Wuhan/D614G strain and Delta variants. A potential risk for mass vaccination? Yahi, Nouara et al.Journal of Infection, Volume 83, Issue 5, 607 - 635, doi: https://doi.org/10.1016/j.jinf.2021.08.010.

[11] Antibody-dependent Enhancement and Vaccines, Children's Hospital of Philadelphia, available at https://www.chop.edu/centers-programs/vaccine-education-center/vaccine-safety/antibody-dependent-enhancement-and-vaccines.

different strains of COVID-19, ADE caused by the COVID-19 biologic may accelerate the virus infecting the cells and resulting in more severe illness.

**Tyson's Discriminatory Treatment of Plaintiffs**

36. Mr. Mitchell was employed as a machining and welding supervisor at Tyson's plant in Amarillo, Texas.

37. Upon Tyson's implementation of the Vaccine Mandate, Mr. Mitchell was subject to the November 1, 2021, deadline to be fully vaccinated.

38. Mr. Mitchell filed a form with the Human Resources department of Tyson, requesting an exemption from Tyson's COVID-19 vaccine mandate on the grounds that the mandate conflicted with his religious beliefs.

39. Tyson denied Mr. Mitchell's request for an exemption from its Vaccine Mandate. Instead, the only option to immediate termination given by Tyson was for Mr. Mitchell to go on the unpaid, unelected, and unprotected leave of absence that Tyson titled *Leave of Absence +* (hereinafter "LOA+").

40. On November 1, 2021, Tyson placed Mr. Mitchell on unpaid leave through LOA+ for up to one year, after which, he would be permanently terminated. Further, if Mr. Mitchell remained unvaccinated after November 1, 2021, Tyson informed him that his job was not protected and Tyson would be actively seek to fill his position in the interim. In this way, Tyson maintained constant pressure upon Mr. Mitchell to surrender his religious objections to vaccination even after it forced him on unpaid leave through LOA+. (A true and correct copy of Tyson's letter to Plaintiff dated September 17, 2021 reflecting portions of said LOA+ status, is attached as *Exhibit B,* and incorporated herein by reference).

41. Mr. Mitchell filed an employment discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") and was granted a Right to Sue Letter on January 19, 2024. This suit has followed.

42. Tyson has made allowances for other employees who refused to comply with the vaccination requirement.

**COVID Vaccines Violate Plaintiffs' Religious Beliefs**

43. Mr. Mitchell holds sincere concerns surrounding the process used to manufacture the vaccines.

44. Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[12]



45. For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[13]

---

[12] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[13] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

46. In an interview with WREG, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[14]

47. As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[15] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[16] that took place in the Netherlands.[17]

48. While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

49. Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on religious grounds to accept or be forced to accept the COVID-19 vaccines.

---

[14] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[15] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[16] *COVID-19 Vaccine and Fetal Cell Lines.*

[17] *Ibid.*

## FIRST CAUSE OF ACTION
### Religious Discrimination
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq. ("Title VII")]**

50. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

51. Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliation against an employee for engaging in protected activity. *Walborn v. Erie Cnty Care Facility*, 150 F.3d 584, 588 (6th Cir. 1998.).

52. Title VII imposes upon an employer the duty to make reasonable accommodations for the religious observances short of incurring an undue hardship. *Reed v. UAW*, 569 F.3d 576, 579 (6th Cir. 2009) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977)).

53. The analysis of a religious accommodation case begins with whether an employee has established a prima facie case of religious discrimination. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)).

54. "To establish a prima facie case, [a plaintiff] must show that '(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement.'" *Id*.

55. "Once an employee has established a prima facie case, [the defendant] has the burden 'to show that it could not reasonably accommodate the employee without undue hardship.'" *Id.* (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)).

56. Plaintiff requested religious exemptions from Tyson's COVID-19 Vaccine Mandate.

57. Defendant's only accommodation for employees opting not to receive a COVID-19 vaccine on religious grounds was one year of unpaid leave, which is akin to termination, with a promise of termination if the employee does not receive a COVID-19 vaccine at the end of that year, and further that Tyson would actively seek to fill the religious objector's position in the interim.

58. Defendant failed to provide Plaintiff with reasonable accommodations for his religious observances as is required under Title VII, as one year of unpaid leave is not a reasonable accommodation, but rather a punitive measure taken against employees who choose to exercise their religious rights.

59. By denying reasonable accommodation and executing punitive measures against employees who refrain from obtaining a COVID-19 vaccine on religious grounds, Defendant discriminated against Plaintiff due to his religious beliefs.

60. Defendant's failure to provide religious accommodations has injured and will continue to injure Plaintiff by discriminatorily denying his employment and income.

61. On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

62. Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiff's religious needs without undue hardship.

63. As such, Defendants have violated Plaintiff's rights under Title VII by discriminating against him on the basis of religion and failing to provide reasonable accommodations or demonstrate undue hardship.

**SECOND CAUSE OF ACTION**
**Disability Discrimination**
**[Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq. (the "ADA")]**

64. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

65. The ADA prohibits, among other things, discriminating against disabled persons' full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations by any person who owns, leases, leases to, or operates a place of public accommodation.

66. To succeed on an ADA claim, a plaintiff must establish that (1) he is disabled; (2) he was qualified to perform either the job he previously held or another available job, with or without reasonable accommodation; and (3) he was denied a reasonable accommodation of his disability, or otherwise suffered an adverse employment decision because of his disability.

67. Under the ADA, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "being regarded as having such an impairment []." (*Id.*, at subparagraph (C)). Under section 12102(3)(A) of the ADA: "An individual meets

the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

68. Defendant regarded unvaccinated individuals such as Plaintiff as being disabled and unable to perform their duties of their employment. Based on this perceived disability, Defendant discriminated against Plaintiff by threatening termination if he failed to receive the COVID-19 vaccine, a "condition" regarded as a disability under Tyson's policy. Indeed, Plaintiff was terminated due to his COVID-19 vaccination status, despite the fact that Plaintiff has successfully performed this same position from which he was just removed since before COVID-19 was introduced to the world.

69. Furthermore, Defendant cannot show that offering alternative, less intrusive accommodations would cause an undue hardship.

70. Defendant's failure to provide medical accommodations has harmed and continues to harm plaintiff; injury includes, but is not limited to, coercing employees to take an untested and potentially unsafe substance, and withdrawing the employment, income, and livelihood of non-compliant employees such as Plaintiff.

71. By failing to engage in the interactive process, offer any reasonable accommodation, and terminating Plaintiff based on his perceived disability, Defendant's discriminatory actions were intentional and/or reckless, and in violation of the ADA.

## THIRD CAUSE OF ACTION
### Religious Discrimination
**[Violation of the Texas Commission on Human Rights Act (the "TCHRA"), sections 21.051 and 21.108]**

72. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

73. The TCHRA prohibits an employer from discriminating against an employer on the basis of religion.

74. Section 21.051 of the TCHRA states that:"An employer commits an unlawful employment practice if because of race, color disability, religion, sex, national origin, or age the employer: ¶ (1) Fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or ¶ Limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee."

75. Section 21.108 of the TCHRA states that religious discrimination under this chapter "applies to discrimination because of or on the basis of any aspect of religious observance, practice, or belief unless an employer demonstrates that the employer is unable reasonably to accommodate the religious observance or practice of an employee or applicant without undue hardship to the conduct of the employer's business."

76. Defendant qualifies as an employer under said provisions of the TCHRA.

77. Plaintiff asserted bona fide religious beliefs that conflicted with Defendant's Vaccine Mandate and notified Defendant of those beliefs by submitting a written exemption request.

78. Defendant had an obligation to reasonably accommodate Plaintiff's sincere religious objections to its Vaccine Mandate. However, Defendant failed to offer a reasonable accommodation o Plaintiff, failed to engage in any meaningful interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's exemption request, and ultimately denied Plaintiff's religious exemption. Instead, Defendant forced Plaintiff to choose between either its unpaid leave program under LOA+, or be immediately terminated outright.

79. By rejecting Plaintiff's religious exemption request, and by denying reasonable accommodation and executing punitive measures against Plaintiff instead, Defendant discriminated against Plaintiff on the basis of his religious beliefs and thereby substantially injured Plaintiff in violation of sections 21.051 and 21.108 of the TCHRA.

**FOURTH CAUSE OF ACTION**
**[Violation of Texas Governor Executive Order No. GA-40 ("Order GA-40")]**

80. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

81. On October 11, 2021, Texas Governor Greg Abbott issued Order GA-40, which states: Executive Order GA-40 states that "[n]o entity in Texas can compel receipt of a COVID-19 vaccine by any individual, including an employee or a consumer, who objects to such vaccination for any reason of personal conscience, based on a religious belief, or for medical reasons, including prior recovery from COVID-19."

82. Order GA-40 went into effect immediately and was effective at the time the instant dispute took place.

83. As set forth herein, Plaintiff objected to Defendant's Vaccine Mandate based on his religious belief, medical reasons, personal conscience, and/or prior recovery from COVID-19.

84. Defendant violated Order GA-40 by, among other reasons, compelling Mr. Mitchell to receive a COVID-19 vaccine under penalty of either forced unpaid leave or immediately termination.

**FIFTH CAUSE OF ACTION**
**Disability Discrimination**
**[Violation of the TCHRA, section 21.002, et seq.]**

85. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

86. The TCHRA defines "disability" as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or ***being regarded as having such an impairment***." § 21.002(6) (emphasis added).

87. Defendant regarded unvaccinated employees such as Plaintiff as disabled based on a perceived disability, immune-compromised due to not receiving a COVID-19 vaccine, and thereby unable to perform the duties of such employees' employment.

88. Based upon this perceived disability, Defendant discriminated against Plaintiff in violation of section 21.002 et seq. by rejecting Plaintiff's exemption request, and forcing him to choose between unpaid leave or immediately termination.

89. By pattern and practice, virtually every employer in America has shown that reasonable accommodations and alternatives to vaccination indeed exist for employees, and these have been required all along since the inception of COVID: self-screening with temperature checks, wearing personal protective equipment, and complying with other

various safety protocols until the number of COVID-19 infections reduced to acceptable levels.

90. Yet Defendant failed to offer Plaintiff a reasonable accommodation in violation of section 21.002 et seq. of the TCHRA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

A. Enjoin Defendant from taking adverse employment action against Plaintiff;

B. Compensatory damages to the extent allowable under Federal and Texas law;

C. An order that Defendant pay Plaintiff's costs and reasonable attorneys' fees; and

D. For such other and further relief as the Court deems appropriate and in the public interest.

DATED: April 18, 2024

Respectfully submitted,

/s/ *Paul M. Davis*
Paul M. Davis
Texas Bar No. 24078401
Paul M. Davis & Associates, P.C.
9355 John W. Elliott Dr. #25454
Frisco, TX 75034
945-348-7884
paul@fireduptxlawyer.com

and

Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: lexisanderson@barneslawllp.com

Attorneys for Plaintiff JOHN MITCHELL

19